UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

**FILED**

OCT 1 4 2015

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| YEV GRAY, DPM aka Yevgeny I. Mandelbroyt, DPM, | ) |
| NATALIE GRAY, J.D. aka Natalie Mandelbroyt, and | ) |
| JAMES SAYADZAD, | ) |
| | ) |
| Defendants. | ) |

# 4:15CR464 RLW/NCC

## INDICTMENT

The Grand Jury charges that:

## INTRODUCTION

1.     At all times relevant to this indictment, defendant Dr. Yev Gray (Dr. Gray) was a licensed doctor of podiatric medicine and practiced in Illinois and elsewhere.  According to records of the Illinois Secretary of State, Dr. Gray is the 100% owner and president of Aggeus Healthcare, P.C. (hereafter "Aggeus Healthcare").  Dr. Gray is also the majority (80%) owner and president and secretary of Aggeus Healthcare, LLC,( now known as Aggeus Global, LLC).

2.     At all times relevant to this indictment, defendant James N. Sayadzad was the chief executive officer (CEO) of Aggeus Healthcare.  Sayadzad was also a minority owner and manager of Aggeus Global, LLC (hereafter "Aggeus Global").

3.     At all times relevant to this indictment, defendant Natalie Gray, the wife of Dr. Gray, was an attorney and the director of corporate and legal affairs for Aggeus Healthcare.  Natalie Gray supervised the billing, finance, and accounts receivable departments at Aggeus Healthcare.

4.   At all times relevant to this indictment, Dr. Gray was a provider in the Medicare Program.

### Relevant Medicare Provisions

5.   The Medicare Program ("Medicare") is a federal health benefits program, as defined by 18 U.S.C. § 24(b).  Medicare provides benefits to persons who are sixty-five years or older or disabled.  In general, Part A of the Medicare Program authorizes payment of federal funds for in-patient care in hospitals and skilled nursing facilities, while Medicare Part B authorizes payment for outpatient health services.  Individuals who receive benefits under the Medicare Program are referred to as Medicare "beneficiaries."

6.   The United States Department of Health and Human Services (HHS), through the Centers for Medicare and Medicaid Services (CMS), administers the Medicare Program.  CMS acts through fiscal agents, which are private companies that process provider applications, review claims, and make payments to providers for services rendered to Medicare beneficiaries. These companies are called Medicare Administrative Contractors (MACs).

### Medicare Provider Enrollment

7.   To receive Medicare reimbursement for services provided to eligible beneficiaries, health care providers, including podiatrists, must submit a written application and execute a written provider agreement.  The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules.

8.   After successful completion of the application process, the MAC assigns the provider a unique provider number, which is a necessary identifier for billing purposes.  A health care provider uses the provider number to file claims with Medicare to obtain reimbursement for medically necessary services provided to eligible Medicare beneficiaries.

9.     In or about March 2004, defendant Natalie Gray, acting on behalf of  Midwest Podiatry Consultants, Ltd. (Midwest Podiatry), obtained a Medicare provider number. Dr. Gray was the president of Midwest Podiatry.

10.     In or about 2006, Midwest Podiatry submitted paperwork to the Medicare contractor, advising that Midwest Podiatry had changed its name to Aggeus Healthcare, P.C.  As a result, the Medicare provider number assigned to Midwest Podiatry was transferred to Aggeus Healthcare P.C.  Midwest Podiatry was involuntarily dissolved in 2006.

11.     As of September 2015, Aggeus Global and Aggeus Healthcare (hereafter collectively "Aggeus") were operating in over 16 states.  Aggeus obtained a separate Medicare provider number for each of its various groups of podiatrists, and thus it has approximately 23 separate Medicare provider numbers.

12.     As part of the provider enrollment process, at various times between in or about 2004 and in or about 2014, Dr. Gray signed one or more CMS-855B forms. These forms advised them of the penalties for falsifying information to gain or maintain enrollment in the Medicare program, as well as the penalties for falsifying information when seeking reimbursement from the Medicare program.

13.     The following notice was included in the CMS-855B forms that Dr. Gray signed:

U.S.C. 1001 authorizes criminal penalties against an individual who, in any matter within the jurisdiction of any department or agency of the United States, knowingly and willingly falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry.

14.     The Medicare provider enrollment applications, signed by Dr. Gray, further stated in Section 15, Certification Statement:

I will not knowingly present or cause to be presented a false or fraudulent claim
for payment by Medicare, and will not submit claims with deliberate ignorance or
reckless disregard of their truth or falsity.

15.     Dr. Gray also signed CMS Form 855 (Section 15), which states: "I have read the

contents of this application.  My signature legally and financially binds this provider to the laws,

regulations and program instructions of the Medicare program."

**Medicare Coverage Of Podiatry Services**

16.     The Medicare Program reimburses health care providers, including podiatrists, for

certain medically necessary foot care services provided to eligible beneficiaries.  Medicare pays

providers directly or pays the employer, if the provider has assigned the payments to the

employer.

17.     The Medicare Benefit Policy Manual (hereafter Medicare Manual) sets forth the

Medicare rules for what services are covered and will be reimbursed by Medicare.  With few

exceptions, the Medicare program does not pay for routine foot care.  The Medicare Manual

states that the "[s]ervices that normally are considered routine and not covered by Medicare

include the following:

- The cutting or removal of corns and calluses;

- The trimming, cutting, clipping, or debriding of nails; and

- Other hygienic and preventive maintenance care, such as cleaning and soaking

  the feet, the use of skin creams to maintain skin tone of either ambulatory or

  bedfast patients, and any other service performed in the absence of localized

  illness, injury, or symptoms involving the foot.  Medicare Manual, Chapter

  15, § 290, Foot Care.

4

18.     "Foot care that would otherwise be considered routine may be covered when systemic conditions such as metabolic, neurologic, or peripheral vascular disease result in severe circulatory embarrassment or areas of diminished sensation in an individual beneficiary's legs or feet." Medicare Manual, Chapter 15, § 290, Foot Care.

19.     "In the absence of a systemic condition that results in circulatory embarrassment, foot care that would otherwise be considered routine may be covered for an ambulatory patient if there is clinical evidence of mycosis of the toenail and the individual beneficiary has marked limitation of ambulation, pain or secondary infection resulting from the thickening and dystrophy of the infected toenail plate. For a non-ambulatory patient, treatment of mycotic nails may be covered if there is clinical evidence of mycosis of the toenail and the individual beneficiary suffers from pain or secondary infection resulting from the thickening and dystrophy of the infected toenail plate." Medicare Manual, Chapter 15, § 290, Foot Care.

20.     "Mycosis is a chronic, communicable infection caused by a fungus which is particularly prevalent in elderly people. Nail debridement involves removal of a diseased toenail bed or viable nail plate. This may be performed manually with an instrument or with an electric grinder." HHS/OIG, Medicare Payments for Nail Debridement Services, June 2002.

21.     The Medicare Manual gives numerous examples of underlying diseases that "might justify coverage for routine foot care." The Medicare Manual further states that "[r]elatively few claims for routine-type care are anticipated considering the severity of conditions contemplated as the basis for this exception. Claims for this type of foot care should not be paid in the absence of convincing evidence that nonprofessional performance of the service would have been hazardous for the beneficiary because of an underlying systemic disease." Medicare Manual, Chapter 15, § 290, Foot Care.

22.     The Medicare Manual also states that if certain class findings are documented (for example edema, burning) there is a presumption of coverage because of the evidence of findings consistent with a diagnosis of severe peripheral involvement.  Medicare Manual, Chapter 15, § 290, Foot Care.

23.     A Doppler study is a non-invasive ultrasound study used to diagnose vascular insufficiency.  Medicare covers a Doppler study only if it is reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member.  Social Security Act: 1862(a)(1)(A) - Medical Necessity: SEC. 1862. [42 U.S.C. 1395y] (a).

**Medicare Record Keeping Requirements**

24.     Medicare regulations require providers, including podiatrists, to maintain complete and accurate medical records reflecting, in part, the purpose of the visit, the patients' chief complaint giving rise to the visit on that day, the medical assessment and diagnoses of the patients and the actual treatment and services provided.  These medical records must include sufficient information to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the provider.

25.     Medicare providers must retain clinical records for the period of time required by state law or five years from the date of discharge if there is no requirement in state law.  Missouri statutes require that physicians maintain patient records for a minimum of seven years from the date the last professional services were rendered.

**Medicare Claim Review and Reimbursement Process**

26.     As stated above, the MACs are private entities that act as fiscal agents for the Centers for Medicare and Medicaid Services.  The MACs review claims and make payments to

providers for services rendered to Medicare beneficiaries. The MACs are responsible for processing Medicare claims arising within their assigned geographic area, including determining whether the claim is for a covered service. Because Aggeus operates in numerous states, more than one MAC received and processed Aggeus reimbursement claims. During the relevant time periods, WPS Health Care Administrators was the MAC for Eastern Missouri and processed Aggeus reimbursement claims for services to patients in Eastern Missouri.

27.     A Medicare reimbursement claim must include certain information, including the beneficiary's name and Medicare number, the services that were provided to the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care professional who provided the services. The reimbursement claim must also contain the Common Procedural Terminology (CPT) code, that identifies each procedure or service provided. Reimbursement amounts are based on the CPT codes.

28.     Medicare pays Aggeus, through the various Medicare provider numbers, via electronic funds transfer. The majority of the electronic funds were deposited directly into the primary Aggeus corporate bank account.

## DESCRIPTION OF AGGEUS

### Organizational Structure

29.     Aggeus Healthcare was incorporated in the State of Illinois on or about May 16, 2005 and has its headquarters in Chicago, Illinois. In or about May 2013, Aggeus Global (also known as Aggeus Healthcare, LLC) was incorporated in Illinois. In 2014, Aggeus Management Group, Inc. merged with Aggeus Global. Dr. Gray and James Sayadzad own both Aggeus Healthcare and Aggeus Global.

7

30.     At various times, Dr. Gray, and others acting in concert with him, established affiliated companies, including professional corporations to provide podiatry services in each state where Aggeus conducted business.  These corporations will be collectively referred to hereafter as Professional Corporations.  Dr. Gray is the owner of most of these Professional Corporations.

31.     Before the 2014 merger, Aggeus Management Group, Inc. had managed the Professional Corporations.  After the merger, Aggeus Global contracted with the Professional Corporations to provide management and billing services.  Aggeus Global also owns the contracts with each of the nursing homes where the Professional Corporations provide services.

**Aggeus Contracts with Facilities**

32.     At all times relevant to this indictment, Aggeus employed or contracted with marketers, who traveled throughout the United States.  Aggeus marketed itself as a provider of ancillary services to residents of long term care facilities or assisted living facilities (collectively referred to hereafter as facility or facilities).  These ancillary services included, but were not limited to podiatry services.  With respect to podiatry services, Aggeus marketers informed the facilities that an Aggeus podiatrist would treat every resident in the facility, regardless of insurance.

33.     A variety of skilled nursing facilities entered into contracts with Aggeus.  The skilled nursing facilities had to provide routine foot care, either by having the nursing home staff provide the service or by paying others to provide the service.  Aggeus' offer to provide foot care at no cost to the facility freed up the facility staff and resulted in a financial benefit to the facility.

34.     Initially, Aggeus podiatrists treated everyone in the facility identified in some way as needing foot care.  However, at some point, Aggeus stopped treating residents whose sole

8

insurance was Missouri Medicaid because Missouri Medicaid ceased paying providers for certain foot procedures. After that, contrary to its marketing pitch to the facilities, Aggeus ceased treating some residents who were only insured by Missouri Medicaid.

**Aggeus Contracted Podiatrists**

35.    Aggeus contracted with podiatrists throughout the Midwest and scheduled the podiatrists to travel to the facilities on a periodic basis to render care. The contracts between Aggeus and the podiatrists typically provided that the podiatrists would receive a base salary plus additional sums based upon the number and type of services the podiatrists performed.

36.    At times relevant to this indictment, Aggeus Healthcare, the Professional Corporations, and affiliated companies provided services in at least 16 different states. In Missouri, Aggeus contracted with podiatrists to provide services in at least 11 skilled nursing facilities, with seven of those facilities located in the Eastern District of Missouri, specifically, in the cities of Bourbon, Hannibal, Maryland Heights, and Poplar Bluff, Missouri.

37.    From January 1, 2009 through September 18, 2015, Aggeus billed the Medicare program approximately $70,172,879 and was paid more than $39,365,741 for podiatry services for over 123,000 beneficiaries. Of those beneficiaries, 106,148 had a diagnosis of dermatophytosis of nail (mycotic nails). Of the $39,365,741 paid to Aggeus, approximately $11,018,418 represented payments from Medicare for trimming and debridements of nails submitted under CPT codes 11719 through 11721. From January 1, 2009 to September 25, 2015, Aggeus podiatrists saw 8,517 beneficiaries in the state of Missouri. Aggeus submitted 50,285 claims, totaling $5,712,965, to Medicare. Medicare paid Aggeus a total of $3,255,333 for these claims.

## DESCRIPTION OF FRAUD SCHEME

**Creation and Use of False Documents**

38.    Dr. Gray created or caused the creation of an electronic medical record (EMR)

system, which the defendants knew would generate patient progress notes and other documents

that did not accurately reflect the actual conditions and diagnoses of the patients.  Dr. Gray

designed the EMR system to include only language which would justify the services provided by

Aggeus.  Natalie Gray and Dr. Gray worked together to ensure that the automated language in the

EMR mirrored the Medicare billing requirements for podiatry services.

39.    Aggeus required the contract podiatrists to use the EMR system to document the

patients' conditions and the services provided to them.  However, in reality, Dr. Gray and Natalie

Gray limited the choices available to the podiatrists and did not permit them to add information,

even if accurate and truthful, into the EMR.  Dr. Gray and Natalie Gray thereby prevented the

podiatrists from adding information that might show the patients did not need or did not receive the

services for which Aggeus would later seek payment from Medicare.

40.    Aggeus podiatrists and employees describe the EMR as a "point and click"

system.  On each screen, the podiatrist had to select one of the options and could not move

forward to the next screen if they did not make a selection.  When the podiatrist made a

selection, the EMR software auto-populated the patient record with pre-determined language.

41.    The final progress note included a subjective section, objective section,

assessment/impressions section, and a plan of care.  The progress note also included certain

information about the patient, including the patient's gender, age, ambulatory status, cognitive

status, and the underlying condition giving rise to the podiatrist's visit that day.  The facility

received a copy of the progress note from Aggeus and the progress note became a part of the patient's official medical record at the facility.

42.     When Aggeus podiatrists entered specific billing codes in the EMR, the system automatically populated the assessment part of the progress note with the canned language selected by Dr. Gray and Natalie Gray.  As an example, when the podiatrist chose the CPT code 11721 (the code for the debridement of 6 or more toenails), the EMR system automatically entered the diagnosis codes for fungus (110.1), peripheral vascular disease (443.9), and pain (729.5).  The diagnoses and related language were inserted into the progress note, even if the patient did not have these diseases or symptoms.

43.     The EMR system automatically inserted in the progress note the following statement: "The patient or staff request treatment because the toenails are painful to a degree as to affect ambulation and balance."  The defendants included this statement to demonstrate that the patient was experiencing pain and the service was not a routine, non-covered service.

44.     The podiatrists were also required to include a statement in the progress note concerning the use of anti-fungal medication to treat mycotic or fungal toenails.  The defendants believed that Medicare would favorably consider this information when reviewing claims for debridements.  The podiatrists were only given two choices:  oral anti-fungal medication was discussed or the oral anti-fungal medication was contraindicated because of the patient's other conditions.  The podiatrists generally chose the first option, although the podiatrists and the defendants knew no such discussion had occurred.

45.     At times, Aggeus employees, who were not podiatrists, would create progress notes by simply entering billing codes into the EMR system which would automatically populate

the progress notes with templates.  These employees prepared these progress notes, at the direction and with the approval of Dr. Gray.

**Defendants' Knowledge of False Progress Notes - Complaints by Podiatrists**

46.    The defendants were aware that the patient medical records, generated by the EMR system, were inaccurate and did not reflect the patient's actual condition.  The defendants were also repeatedly informed that podiatrists were not performing certain services listed on the progress notes.

47.    Some podiatrists complained that the progress notes were inaccurate because they were unable to modify the language in the EMR and could not add their comments to the EMR. While some podiatrist signed the notes, other podiatrists refused to sign the progress notes. Other podiatrists recognized the progress notes were inaccurate, but continued to complete them and sign them.

48.    On June 10, 2011, Dr. A.B., an Aggeus podiatrist, emailed the director of operations (DOO) at Aggeus about the issues she was having with the EMR.  Dr. A.B. indicated that she had to choose an "option that is contradictory to my prescription and it makes my notes inaccurate."

49.    On April 30, 2011, Dr. J.M., an Aggeus podiatrist, advised that she received a call from a patient's son, who indicated that his mother had no foot problems and he was going to report Dr. J. M. for Medicare fraud.  Dr. J.M. suggested that someone from billing needed to call this man and get it straightened out to clear her name, license, and reputation.

50.    On or about November 7, 2012, shortly after entering into a contract with Aggeus, Dr. M.K. sent an e-mail to Dr. Gray and Sayadzad.  Dr. M.K. stated that he had witnessed blatant Medicare fraud by Aggeus podiatrist , Dr. A.L., when he was shadowing her.  Dr. M.K. informed

Dr. Gray and Sayadzad that he observed Dr. A.L. billing for medically unnecessary debridements, the removal of non-existent callouses, evaluation and management services when no examination was done, and routine foot care that was not covered by Medicare.

51.     Dr. M.K. also stated that Dr. A.L. falsely indicated in the progress notes that patients had no pulse although Dr. A.L. did not touch the patients, palpate for a foot pulse, or even remove the ankle wrap or compression sleeve from the patient's ankle or foot. Dr. M.K. characterized what he observed as "incompetence, rampant Medicare fraud, unhygienic practice and lack of ethics and professionalism."

52.     On August 24, 2012, Dr. R.G., an Aggeus podiatrist, emailed Sayadzad regarding Mount Carmel Communities: "I believe at one time you asked to be made aware of any issues about doctors…This may be the pot calling the kettle black but: Was at Mount Carmel Communities today, a home visited last by a doctor whose name shall go unmentioned. Our contact person brought it up. One of the patients has a daughter who is a physician and she exploded when she received the EOB. She examined her mother and stated definitively that the procedure was not done and its fraud and she was going to report it to Medicare. Several other patients also had issues. Anyway the list I had for today included 41 patients of those there was follow up for I&Ds [incision and drainage] on 27 !! of them sometimes multiple procedures on a patient. There were also nail removals on 14 patients sometimes multiple nails plus I could throw in a couple ulcer debridement's. I can state definitely that six of those nail avulsions were not done at all. The rest I'll have to wait and see if the chart mentions one edge vs total. If total was sent in its bogus. I have been at two homes this week following a visit by this doc. I am convinced that if he nicked someone and made them bleed (the home stated that a bloody trail was left) he bills an

13

I&D if he had to grind a nail he billed a removal. If he trimmed down a callous he billed for an ulcer."

53.     On November 7, 2012, Dr. M.K. informed Dr. Gray and Sayadzad in an email that the Doppler tests were not performed properly. Doppler tests are supposed to be done when the patient is lying down and the Aggeus technician did the tests while the patient was standing up. If the pressure was taken in the arm, the cuff was placed over sleeves, sweaters, and sweat shirts and the pressure was not valid.

54.     In or about October 2013, Dr. M.R. sent an e-mail to Dr. Gray expressing his concerns about billing for Dopplers. In the e-mail, he stated: "I still think doing the Doppler's is a great idea to confirm the medical necessity of our treatments. However, in none of my research did I find this as an appropriate reason to justify the medical necessity and billing of 93922." In response to Dr. M.R. concerns about billing for Dopplers, Dr. Gray told Dr. M.R. to contact each of the medical directors at the facilities and tell them to add peripheral vascular disease to the residents' charts.

## Defendant's Knowledge of False Progress Notes - Complaints By Facilities

55.     In addition to the complaints from podiatrists, Aggeus employees received complaints daily from facilities about the progress notes, including complaints that the notes were inaccurate, the assessments were repetitive, and the notes were the same for all the patients. When Aggeus employees received complaints, often they would speak directly to the defendants. Sayadzad and Dr. Gray told employees that they would handle the complaints and that the information included in the progress notes was there because it was required for Medicare reimbursement. Aggeus employees in turn told the facilities that Aggeus inserted what was required by Medicare in the progress notes.

56.     On or about May 8, 2009, the Director of Nurses (DON) at Villa Vista Care Center complained that all the progress notes looked the same. This complaint was forwarded to Sayadzad and Natalie Gray. Sayadzad indicated that he would reply to the complaint.

57.     Just 6 days later, on May 14, 2009, the Wisconsin Lutheran Care Center complained to Aggeus that all the plans of care in the notes looked the same. This complaint was forwarded to Natalie Gray.

58.     On October 1, 2009, the manager of Hometown Retirement complained that 11 of the 12 podiatry progress notes indicated patients had painful nails. The manager was sure that the nails were not painful. This complaint was forwarded to Natalie Gray, who assigned the complaint to Sayadzad.

59.     On March 22, 2011, the Brookdale Living Nursing Home complained to Aggeus about residents seen by an Aggeus podiatrist. The facility questioned why the bill was over $200 for toenail clipping that took less than 15 minutes. The facility also questioned a charge for "trimming skin lesions" for $56.00 when nothing except toenail clipping was done.

60.     On November 10, 2011, the DON of Parkside Care Center complained to Aggeus marketer J.L. about the podiatry notes from the October visit. The DON stated: "The statement concerning patient M.M. being alert and oriented x3 is not true on any day. She cannot put words together to complain about toenails."

61.     On December 2, 2011, Provena Cor Maria Nursing Home questioned the statement in the progress notes that the antifungal treatment options were reviewed and discussed.

62.     On December 8, 2011, the administrator of San Luis advised Aggeus marketer J.L. that the facility's medical director would report Aggeus for Medicare fraud due to the number of

Dopplers that Aggeus was doing without the consent of the primary care physician or responsible party.

63.     On December 8, 2011, the DON and the administrator from Summit Villa told Aggeus marketer J.L. that the Aggeus doctor did "nothing but clip toenails; no blisters; no debridement's; in the plan of care it states that doctor obtained verbal consent and counseled the patient and staff. 100% never happened and they want that removed immediately from all notes; He saw 17 residents in less than 2 hours which they say is unacceptable."

64.     On January 2, 2012, the DOO of the Harbor House facilities in Beloit and Clinton, Wisconsin, told Aggeus marketer J.L.: "Clinton…podiatry notes that are mailed here are false. Mary did call them last time on this and we did not hear anything back. Last month when they were here there are several false statements in dictation notes from the doctor such as resident A.S. has foam device on toes and she does not nor has she ever. Also all of them state that the facility requests that residents be seen based on prior complaints of lower extremity pain. We have never told anyone this or requested that they come out for that. We want them to come out to cut toenails."

65.     On January 23, 2012, an employee from Inola Healthcare Oklahoma emailed Aggeus marketer J.L.: "A&Ox3 incorrect; no physician orders when required; patient in wheelchair incorrect; why all patients require fungal meds and biopsy."

66.     On February 6, 2012, Aggeus employee A.C. emailed Dr. R., an Aggeus podiatrist. The email stated the following:  "We received a call from Lyon Manor regarding an issue with their progress note from the last podiatry visit on January 24, 2012. In the subjective section the second sentence states 'The patient or staff request treatment because the toenails are painful,

ingrown and remain symptomatic even when resting.' The facility stated this is not true because patient's pain is monitored and nothing has been reported."

67.    In response to the February 6, 2012 email, Dr. R. writes to A.C. and copies Sayadzad stating that both she and Dr. M. feel that the formatted notes are not worded correctly and this is not the language we would use when dictating or writing notes into the notebook. Sayadzad responded, saying to refer these complaints to him in the future.

68.    On May 29, 2012, an Aggeus employee stated in an email concerning NHC Maryland Heights located in Missouri: "we received a call from facility regarding some concerns on the progress note for patient A.C. from visit of 5/9/2012. Definitive antifungal treatment options reviewed and discussed. The facility stated that 90% of the clientele is non-responsive. The home is requesting the notes to be corrected to read properly." Dr. D. responded: "I will review this and make an amendment but please note that part of the problem is that this is preprinted text in the form of a template, and it is sometimes hard to void this because it is a template."

69.    On June 7, 2012, Aggeus marketer J.L. emailed the Aggeus DOO, regarding Littlefield Nursing in TX: "Please fax all notes to Donice as she cannot access them online... family is livid and complaining of Medicare fraud."

70.    On July 11, 2012, Aggeus marketer J.L. emailed the Aggeus DOO, regarding Cross Roads in MN: "She said herself and the Admin are not comfortable with our notes and they do not believe we are doing what the progress note states we are doing. Many alert residents are complaining of fees and saying they are doing nothing more than clipping my nails and then the progress note states we are doing I&Ds shaving etc. Families are also watching procedures and (*indicate that we are*) not doing what we are saying we are doing."

71.     On July 20, 2012, an employee from Parkside Manor Center emailed Aggeus marketer J.L.: "I am going to forward you an explanation of benefits that resident's family brought to our attention and the note from the Aggeus visit. Do these charges look reasonable to you? As a tax payer I'm not sure I agree."

72.     On July 24, 2012, an employee from Parkside Care Center Little Chute, WI emailed Aggeus marketer J.L.: "patient M.M. alert and oriented x 3 is not true on any day. She could not put the words together to complain of toenails even if she understood the question. I am concerned that the podiatrist's notes diminished skin turgor since that implies dehydration. I notice on almost every resident the podiatrist notes there is clear evidence of progressing peripheral arterial insufficiency. Is this a diagnosis? Patient A.B. again we have the implication of dehydration. The podiatrist notes that she appears to be contracted. This woman has no history of contracture."

73.     On August 7, 2012, an employee from Provena Life Connections emailed Aggeus podiatrist Dr. K.M.: "patient B.M. progress notes from March, April and July have incorrect information on them. It states that she is Caucasian (not), in a wheelchair (not). P.M. and B.P. are upset and calling Aggeus."

74.     On August 22, 2012, Aggeus marketer J.L. emailed Sayadzad regarding Dunn County: "Might want to call this home and do a little TLC. Getting a vibe they are about to cancel. Pulling everyone out of service due to family complaints on billing etc. DON and ADON have serious sanitation concerns as they have observed our providers not clean instruments." Sayadzad writes back saying this is bullshit, there are no infections.

75.     On August 23, 2012, Aggeus marketer J.L. emailed Aggeus employee R.D. regarding Milwaukee Estates: "who is podiatry here? Just there- serious complaints."

18

76.     On October 16, 2012, an Aggeus employee R.D. emailed Sayadzad regarding Tudor Oaks and Northpoint stating:  "Resident L.O. and her husband claim that Dr. O. looked at each one of their feet, trimmed half their nails and charged them $167 a piece.  This lady called Humana and reported Medicare fraud as they had a resident council meeting and numerous residents thought the same thing."

77.     On March 6, 2013, S.C. emailed Aggeus marketer J.L.:  "Just talked with ..., the NE regional manager from Healthdrive.  He was making it clear that Aggeus is unethical and there is no way that you will be able to provide quality services.  ... That you are losing services because you are unethical."

78.     On June 14, 2013, Aggeus podiatrist Dr. M.R. emailed Dr. Gray regarding a facility in Lebanon, MO:  "Hi Yev...Huge learning curve with EMR but slowly getting the hang of it... I was at a RCF in Lebanon, MO and it was a real stretch to qualify some of the patients.  They were mostly psych patients, and many of the young ones were very healthy.  It was a stretch to have PVD auto populate the EMR field when performing a nail or lesion debridement, and then qualify with a Q8 or Q9.  Dr. G. had similar concern that folks in Aggeus don't always understand, not every PT qualifies for treatment."

79.     On February 14, 2014, Aggeus marketer J.L. emailed Aggeus employees L.M. and K.K. regarding Shady Oaks, Iowa:  "Not sure who the podiatrist was that went here last week but a good amount of complaints.  [Patient B.S.] was gushing with blood like a water fountain from what they were doing.  This man can't speak do to his illness and was showing a ton of discomfort and the doc kept digging.  [Patient L.C.] they removed an ingrown toe nail that she claims was not ingrown and she was having no issues with at all.  She asked them not to touch it and they still did

it anyway. After it was done they were not going to clip her nails until she asked and they quoted 'I guess we have time if it goes quick.'"

80.     On June 18, 2014, Campus Health Unit Clerk emailed Aggeus marketer J.L. regarding Evergreen Oshkosh: "Please have someone call me back regarding Patient E.P., he was charged for services he did not have. This is now the 2nd time this has happened. Aggeus need to call him and apologize or he is going to call Medicare for Medicare fraud."

**COUNT 1**
**THE CONSPIRACY AND ITS OBJECTS**
**18 U.S.C. § 371**

81.     Paragraphs 1 to 80 are incorporated by reference as if fully set out herein.

82.     From in or about 2009 and continuing to in or about 2015, in the Eastern District of Missouri and elsewhere,

**YEV GRAY, DPM aka Yevgeny I. Mandelbroyt, DPM,**
**NATALIE GRAY, J.D. aka Natalie Mandelbroyt, and**
**JAMES SAYADZAD,**

the defendants herein, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together, and with each other, to defraud the United States and to commit offenses against the United States, that is,

a.  to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program, in connection with the delivery and payment for health care benefits, items, and services, in violation of 18 U.S.C. § 1347;

b.  to knowingly and willfully falsify, conceal, and cover up by trick, scheme, and device a material fact; make materially false, fictitious, and fraudulent statements, and representations; and make and use a materially false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry,

20

in connection with the delivery of and payment for health care benefits, items, and services, in violation of 18 U.S.C. § 1035.

## PURPOSE OF THE CONSPIRACY

83.    The purpose of the conspiracy was for the defendants and the other co-conspirators:

a.  to obtain reimbursement for health care services which the defendants knew were medically unnecessary, up-coded, or not provided;

b.  to create and use documents and writings and to make false, fictitious, and fraudulent statements and representations to conceal and cover up the health care fraud scheme; and

c.  to provide the proceeds of the fraud scheme to the defendants and other co-conspirators.

## MANNER AND MEANS OF THE CONSPIRACY

84.    It was part of the conspiracy that the defendants contracted with skilled nursing facilities to provide podiatry services to residents of the facilities, at no cost to the facilities.

85.    It was further part of the conspiracy that the defendants contracted with podiatrists to provide the services and encouraged and pressured the podiatrists to provide more and different types of services, even if the services were medically unnecessary.

86.    It was part of the conspiracy that the defendants encouraged and pressured Aggeus podiatrists to order and perform Doppler tests, although the defendants knew the tests, as performed by Aggeus, had no clinical or medical value.

87.     It was further part of the conspiracy that the defendant established an EMR system that they knew would produce inaccurate progress notes to increase the likelihood of receiving Medicare reimbursement for services.

88.     It was part of the conspiracy that the defendants, and their employees and contract podiatrists at their direction, created and caused the creation and use of false and fraudulent patient medical records and other documents.

89.     It was further part of the conspiracy that the defendants, and their employees and contractors at their direction, submitted and caused the submission of false and fraudulent reimbursement claims.

90.     It was further part of the conspiracy that the defendants did not disclose and concealed that Aggeus had billed and been paid for services that were not rendered or were not covered by Medicare and did not return the overpayments to Medicare.

## OVERT ACTS

91.     In furtherance of the conspiracy, and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Missouri.  In each instance described below, Aggeus billed for the debridement of mycotic nails.

### Levering Regional Healthcare, Hannibal, Missouri
### Patient C.B.

92.     C.B. is a resident at Levering Regional Healthcare in Hannibal, MO (Levering). C.B. has been confined to a wheelchair since his admission to the facility in 2003.

93.     On December 21, 2011, Dr. A.B. treated C.B. and created a progress note that falsely stated "the patient or staff request treatment because the toenails are painful to such a degree as to affect ambulation and balance."

94.     On February 21, 2012, Dr. A.B. treated C.B. and created a progress note that falsely stated that the patient presents ambulatory. The note further falsely stated "the patient or staff request treatment because the nails are painful to such a degree as to affect ambulation and balance."

95.     On April 25, 2012, Dr. J.D., another Aggeus podiatrist, treated C.B. and created a progress note that falsely indicated C.B. presented ambulatory. The note further falsely stated that "the patient or staff requested treatment because the toenails are so painful as to affect ambulation or balance."

96.     On May 8, 2012, 13 days after his previous visit, Dr. J.D. treated C.B. and created a progress note that falsely stated the patient presents ambulatory. The note further noted "the patient or staff requested treatment because the toenails are painful as to affect ambulation and balance."

**NHC Maryland Heights, Missouri**
**Patient R.K.**

97.     R.K. was a resident at NHC Healthcare in Maryland Heights, MO. Dr. A.B. created a progress note for January 23, 2013 that falsely stated "the patient or staff requests treatment because the toenails are painful to such a degree as to affect ambulation and balance."

98.     On February 27, 2013, Dr. D.H., another Aggeus podiatrist, treated R.K. and created a progress note that falsely stated "the patient or staff request treatment because the toenails are painful, ingrown, and remain symptomatic even when resting." This service allegedly was provided 35 days after Dr. A.B.'s service on January 23, 2013.

99.     On April 2, 2013, Dr. A.B. treated R.K. and created a progress note for the visit that falsely stated that R.K. suffered from "painful nails that affected his ambulation and balance."

100.    About a month later, on May 1, 2013, Dr. D.H. again treated R.K. and created a progress note that falsely stated R.K. suffered from "painful, ingrown nails that remain symptomatic even at rest."

101.    About a month later, on June 3, 2013, Dr. A.B. treated R.K. and created a progress note that falsely stated that R.K. suffered "painful nails that affected his ambulation and balance."

102.    On August 5, 2013, Dr. A.B. treated R.K. and created a progress note for the visit that falsely stated R.K. suffered from "painful nails that affected his ambulation and balance."

103.    On September 16, 2013, Dr. A.B. treated R.K. and created a progress note for the visit that falsely stated R.K. suffered from "painful, ingrown nails that remain symptomatic even at rest."

## Hillcrest Residential Care Center, Columbia, Missouri
## Patient G.E.

104.    G.E. was a resident at Hillcrest Residential Care Center in Columbia, MO.  On March 21, 2012, Dr. D. rendered care to G.E. and created a progress note that stated G.E. "was seen today for routine care and painful nails."

105.    About a month later, on April 24, 2012, Dr. A.B. treated G.E. and created a progress note that stated "the patient or staff requested treatment because of painful nails."

## Patient A.C.

106.    On June 25, 2014, Dr. G. treated A.C. and created a progress note for the visit that falsely stated "the patient presents with grossly discolored and thickened nails which appear symptomatic on physical examination."

24

**Patient P.L.**

107.    On June 25, 2014, Dr. G. treated P.L. and created a progress note that falsely stated "the patient presents with grossly discolored and thickened nails which appear symptomatic on physical examination."

**Patient M.L.**

108.    On June 25, 2014, Dr. G. treated P.L. and created a progress note for the visit that falsely  stated "the patient presents with grossly discolored and thickened nails which appear symptomatic on physical examination."

**Redwood Manor, Bourbon, Missouri**
**Patient B.A.**

109.    B.A. is a resident at Redwood Manor located in Bourbon, MO.  On June 21, 2011, Dr. A.B. treated B.A. and created a progress note that falsely stated "facility requests that B.A. be seen based on prior complaints of lower extremity pain.  The patient or staff requests treatment because the toenails are painful to such a degree as to affect ambulation and balance."

**Patient J. M.**

110.    J.M. was a resident of Redwood Manor.  J.M. never had problems with his toenails, mowed the facility's lawn, and assisted in unloading the food truck when it arrived at Redwood Manor.  On June 21, 2011, Dr. B. treated J.M. and created a progress note for the visit that falsely stated "facility requests that J.M. be seen based on prior complaints of lower extremity pain.  The patient has difficulty walking.  The patient or staff requests treatment because the toenails are painful to such a degree as to affect ambulation and balance."

All in violation of Title 18, United States Code, Section 371.

25

The Grand Jury further charges that:

**COUNTS 2-5**
**False Statements Involving**
**Health Care Benefit Plan**
**Title 18, United States Code, Section 1035(a)(1) and Section 2**

111.    Paragraphs 1 to 80 are incorporated by reference as if fully set out herein.

112.    On or about the dates indicated below, in the Eastern District of Missouri,

**YEV GRAY, DPM aka Yevgeny I. Mandelbroyt, DPM,**
**NATALIE GRAY, J.D. aka Natalie Mandelbroyt, and**
**JAMES SAYADZAD,**

the defendants herein, in a matter involving a health care benefit program, knowingly and willfully made and used, and caused to be made and used, materially false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements and entries in connection with the delivery of and payment for health care benefits, items, and services, in that the defendants submitted and caused to be submitted to Medicare false reimbursement claims for the following patients.

| Count | Patient | Date of Service | Date of Claim | Paid Amount |
|-------|---------|-----------------|---------------|-------------|
| 2 | B.A. | June 21, 2011 | July 11, 2011 | $120.76 |
| 3 | J.M. | June 6, 2012 | November 7, 2012 | $70.14 |
| 4 | S.C. | March 26, 2013 | March 28, 2013 | $75.19 |
| 5 | P.L. | June 24, 2014 | June 30, 2014 | $77.73 |

All in violation of Title 18, United States Code, Section 1035(a)(1) and Section 2.

**FORFEITURE ALLEGATION**

The Grand Jury further finds probable cause that:

1.    Pursuant to Title 18, United States Code, Section 982(a)(7), upon conviction of an offense in violation of Title 18, United States Code, Section 1035 or 1347 or a conspiracy to commit such offense as set forth in Counts 1 through 5, the defendants shall forfeit to the United

26

States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense or conspiracy.

2.     Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense.

3.     Specific property subject to forfeiture includes, but is not limited to, the following:

> a.     certain real property located at 1919 South Prairie, Apartment #2, Chicago, Illinois 60616, together with all appurtenance, improvements, and attachments thereon, which is more particularly described as Parcel ID #17-22-309-122-1002, Residential Condominium, Township: South Chicago, Neighborhood: 11;
>
> b.     certain real property located at 401 N. Wabash, Unit 72G, Chicago, Illinois 60611, together with all appurtenance, improvements, and attachments thereon, which is more particularly described as Parcel 1: Unit 72G in the residences at 401 North Wabash Avenue, a condominium, Parcel ID #17-10-135-038-2027, Residential Condominium, Township: North Chicago, Neighborhood: 30;
>
> c.     certain real property located at 210 East Walton Place, Unit E, Chicago, IL 60611, together with all appurtenance, improvements, and attachments thereon, which is more particularly described as Parcel ID #17-03-208-024-1005, Residential Condominium, Township: North Chicago, Neighborhood: 22; and

    d.    certain real property located in Costa Rica that was purchased with or

otherwise funded by two wire transfers in total amount of $423,966 on or

about January 8, 2014 and February 12, 2014 from account at JP Morgan

Chase ending in 5337, held in the name of Yev Gray.

A TRUE BILL.


_____

FOREPERSON


RICHARD G. CALLAHAN
United States Attorney


_____

DOROTHY L. McMURTRY, #37727
Assistant United States Attorney

28